THOMAS E. LOESER, Cal Bar No. 202724
tloeser@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcom Road
Burlingame, CA 94010

and

THOMAS E. LOESER, Cal Bar No. 202724
tloeser@cpmlegal.com
KARIN B. SWOPE (pro hac vice to be filed)
kswope@cpmlegal.com
JACOB M. ALHADEFF (pro hac vice to be filed)
jalhadeff@cpmlegal.com
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Telephone:    (206) 802-1272
Facsimile:    (206)-299-4184

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| GamersNexus LLC,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>PAYPAL HOLDINGS, INC., a California Corporation, PAYPAL, INC., a California Corporation,<br><br>　　　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, GamersNexus LLC, individually and on behalf of all others similarly situated ("Plaintiff"), brings this action against Defendant PayPal Holdings, Inc. and Paypal, Inc.

1

Class Action Complaint

("Defendants"), seeking monetary damages restitution, and/or injunctive relief for the proposed Class and Subclass, as defined below. Plaintiff makes the following allegations upon information and belief, the investigation of their counsel, and personal knowledge or facts that are a matter of public record.

## I.   INTRODUCTION

1. Honey is a popular web browser extension that purports to automatically scan the internet for available coupon codes and apply them at checkout at no cost to the consumer. Honey claims that when a user visits an ecommerce store, Honey searches its database of promotional codes and systematically tests these codes to identify the one offering maximum savings.

2. In January 2020, PayPal Holdings Inc. acquired Honey Science Corporation for $4 billion. This is PayPal's largest ever acquisition. PayPal has since taken full control of the company and rebranded the extension "PayPal Honey." At the time of purchase, PayPal stated that Honey helped approximately 17 million monthly active users.

3. PayPal Honey's Terms of Use state that "PayPal does not charge fees to you for its Service… We make money to sustain the Service when you purchase or engage with these offers."[1] PayPal Honey makes money on user ecommerce purchases by manipulating last-click attribution to ensure that they hijack content creators' affiliate commissions.

4. Ecommerce affiliate commissions power much of the content creator ecosystem by providing influencers with commissions for promoting a business' products. These YouTubers, podcasters, bloggers, and social media influencers ("Content Providers") generate income when their audience members purchase specific products. When their audience makes purchases through the Content Providers' specialized tracking links, cached in the user's cookies, the content creator receives an affiliate marketing commission that is historically between 1-20% of the product price.

---

[1] See, https://www.joinhoney.com/terms/us (last visited January 2, 2025).

2

Class Action Complaint

5. These affiliate commissions are paid by last-click attribution. Last-click attribution ensures that even if a user both read a blog and watched a YouTube product review, only the creator that last directed the consumer to the eCommerce merchant receives the affiliate commission. Last-click attribution recognizes the final creator that sent the consumer to the merchant as generating the sale and allocates the commission accordingly.

6. Defendants, through the Honey extension, unlawfully supplant this system of lead generation by stealing the commission during the point-of-sale. Honey systematically appropriates these commissions by replacing the content creator's cached affiliate URL snippets with their own. Plaintiff and the Class would generate the sale, then while the consumer was checking out Honey would covertly replicate last-click attribution to receive the commission. This cookie stuffing scheme wrongfully captured millions of dollars in affiliate marketing commissions.

7. By this Complaint, Plaintiff seeks to remedy these harms on behalf of itself and all similarly situated individuals whose commissions were stolen.

## II.    FACTS

**A.    Digital Marketers Commission System**

8. ECommerce merchants market their products through the use of affiliate marketing commission links provided to influencers and content creators. These creators include YouTubers, bloggers, podcasters, Instagram influencers, TikTokers, and much more. Many of these content creators and merchants work through affiliate networks that act as intermediary platforms connecting eCommerce merchants with affiliate promoters and managing the technical implementation. This affiliate marketing industry has surged to $15.7 billion in 2023.[2]

9. Affiliate marketing is based on tracking tags in the form of cookies, and last-click

---

[2] 18 Affiliate Marketing Statistics for 2025, Rewardful, December 5, 2024, https://www.rewardful.com/articles/affiliate-marketing-statistics (last visited January 2, 2025).

attribution.

10. Content creators earn their commissions by providing specialized tracking links to their audience. These tracking links are unique URLs that connect consumers to merchants' product pages while recording the referral source in the form of a cookie that is stored on the consumer's web browser. This cookie has a defined lifetime, often no more than 90 days, during which time the affiliate can receive credit for the purchase, even if the customer returns to the merchant's site directly.

11. If the user is directed to the merchant's site by a second affiliate content creator, then the original affiliate marketer's cookie is overwritten ensuring that only the creator that generated the last-click receives the commission.

B. **The PayPal Honey Web Browser Extension**

12. Consumers download the PayPal Honey browser extension under the promise that Honey will search the web for the best coupons to ensure consumers pay the lowest prices when checking out with eCommerce merchants.

13. Honey then partners with these eCommerce merchants to give them "control over the content hosted on the Honey platform."[3] For this control Honey receives a 3% commission applied to each purchase a member makes on the merchant's site. After this affiliate network partnership is established, on information and belief, Honey deliberately withholds higher-value coupons, directly contradicting Honey's promise to consumers.

14. Users receive Honey benefits by interacting with the web extension or application during the point-of-sale, at the end of the customer journey. Users are prompted on the check-out page to scan for discounts.

---

[3] See, https://get.joinhoney.com/business/faq/ (last visited January 2, 2025).



15. Upon clicking the PayPal Honey button to apply discounts or search for coupons, a small tab is opened on the user's browser. This acts like a simulated affiliate referral link, even though the customer is already on the website and at the checkout page. PayPal has at that point stuffed a cookie onto the customer's web browser replacing the prior referral.

16. Honey is purposely designed to exploit last-click attribution. Honey stuffs customer cookies to steal affiliate commissions or charge merchants' commissions even though Honey did not refer a customer to the merchant's site.

Class Action Complaint

5

**C. Honey Extension Activation**

17. PayPal uses every possible artifice to get the consumer to click on their artificial referral button to steal affiliate commissions.

18. **Scenario 1:** After being referred to a product website by an affiliate, the customer proceeds to checkout. Honey creates a pop-up alerting the customer that it has identified a coupon incentivizing them to apply these coupons. Upon clicking the "Apply Coupons" button, Honey's cookie stuffing scheme displaces the prior affiliate marketer and invisibly inserts its own affiliate tag. Honey has stolen the commission.



19. **Scenario 2:** The same customer proceeds to checkout and Honey creates another pop-up alert. However, this time Honey has no coupons and simply informs the customer should "checkout with confidence knowing we looked." This incentivizes the customer to get rid of the pop-up, so they can complete their purchase. Upon clicking "Got it," Honey's cookie stuffing scheme again displaces the prior affiliate tag and Honey has stolen the commission.



20. **Scenario 3:** Honey created a rewards program, Honey Gold, to further steal commissions even when no coupons are available. Honey Gold, or PayPal rewards, gives users redeemable points even when coupon codes are unavailable. Here again, when the user clicks "Activate Rewards," Honey displaces the prior affiliate tag stealing the commission. In one creator's example referring NordVPN, Honey rewarded the shopper with 89 Honey Gold Points, worth only $0.89, and siphoned the affiliate marketer's commission of $35.60.



21. **Scenario 4:** The same customer proceeds to checkout and Honey creates another pop-up alert even though they have no coupons or reward points to offer the customer. This pop-up is merely a checkout button, but rather than requiring the customer to close it before using the

merchant's standard checkout, they are encouraged to click on PayPal's checkout option instead.



22.     In each scenario, PayPal Honey uses any possible artifice to encourage the customer to click on their links, which generates their artificial referral cookie and steals commissions from the affiliate marketers.

**D.     Plaintiff's And The Class's Harm**

23.     Defendants systematically steal commissions from content creators that promoted the merchants' products and drove customers to their eCommerce stores.

24.     Plaintiff GamersNexus has worked since 2008 to review products and provide valuable content to viewers through their website, YouTube, and social media channels. GamersNexus has created 3033 videos, which have been viewed 684,000,000 times. Creating such useful content has garnered GamersNexus 2.4 million subscribers.

25.     GamersNexus uses affiliate marketing links to direct people to NewEgg and Amazon. GamersNexus has relied on affiliate marketing since at least 2015. At its peak, GamersNexus generated approximately $161,600.00 in affiliate marketing revenue. In 2023, its affiliate marketing revenue was down to approximately $52,700.00 even though its channel has

experienced substantial growth in the intervening years.

26. GamersNexus has spent substantial time and money developing a community of viewers that support it. GamersNexus has spent substantial time and money reviewing products for which it provides affiliate links.

27. When PayPal Honey's cookie stuffing scheme artificially replaces GamersNexus' referral tag with their own, GamersNexus has been deprived of referral fees and sales commissions to which it is rightfully entitled.

### III. JURISDICTION, VENUE, AND CHOICE OF LAW

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq.*, because at least one member of the Class, as defined below, is a citizen of a different state than the Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

29. This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business in San Jose, California, in this District, they have sufficient minimum contacts with this District, and have purposefully availed themselves of the privilege of doing business in this District such that they could reasonably foresee litigation being brought in this District.

30. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendants' principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in, was directed to, and/or emanated from this District.

## IV.   PARTIES

### A.   Plaintiff GamersNexus LLC

31. Plaintiff GamersNexus is a limited liability company organized and existing under the laws of North Carolina. GamersNexus' principal place of business is Apex, North Carolina.

### B.   Defendant PayPal Holdings, Inc.

32. PayPal Holdings, Inc. is a Delaware corporation that holds all assets and liabilities of PayPal, Inc. a subsidiary corporation organized and existing under the laws of Delaware. PayPal Holdings, Inc. and PayPal, Inc. are collectively referred to in this Complaint as "PayPal." PayPal transacts business and is headquartered within this judicial district, specifically at 2211 North First Street, San Jose, California 95131.

33. PayPal purchased the Honey Science Corporation in 2020, which originally developed the Honey browser extension. PayPal owns and operates the Honey Science Corporation and the term "PayPal" in this complaint, unless otherwise noted, encompasses Honey.

## V.   CLASS ACTION ALLEGATIONS

34. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

   a. **Nationwide Class:** All persons and entities in the United States who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to PayPal as a result of Honey.

   b. **North Carolina Subclass:** All persons and entities in North Carolina who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to PayPal as a result of Honey.

35. **Numerosity and Ascertainability:** Members of the Class are so numerous that joinder is impracticable. The Class encompasses at least tens of thousands of individuals and entities geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclass, such that joinder of all subclass members is similarly impracticable.

Class Action Complaint

36. **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class members. These common questions include:

    a. Whether PayPal developed and structured the Honey browser extension in a way that unfairly attributes sales referrals to PayPal;

    b. Whether PayPal was unjustly enriched to the detriment of Plaintiffs in the form of commission payments;

    c. Whether the system described herein results in PayPal being awarded commission payments it did not rightfully earn;

    d. Whether consumers and Class members have been damaged by PayPal's conduct; and

    e. The nature and scope of appropriate injunctive relief.

37. **Typicality:** Plaintiff's claims are typical of the other Class members' claims because all Class members were comparably injured through Defendants' substantially uniform misconduct, as described above. Plaintiff is advancing the same claims and legal theories on behalf of itself and all other members of the Class that it represents, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and Class members arise from the same operative facts and are based on the same legal theories.

38. **Adequacy:** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other members of the Class it seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiff and its counsel.

39. **Superiority:** A class action is superior to any other available means for the fair and

efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiff and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not: individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## VI.   STATUTE OF LIMITATIONS TOLLING

40. All applicable statute(s) of limitations have been tolled by PayPal's active and knowing concealment and denial of the facts alleged herein. Plaintiff and Class Members had no reasonable means of discovering that PayPal was covertly stuffing cookies and modifying network data to claim commissions for sales it did not legitimately generate.

41. PayPal has an ongoing obligation to disclose to Plaintiff and Class Members of its practice of replacing affiliate marketing tags that identify marketers as the source of referrals, substituting them with its own tracking tags to redirect commissions that rightfully belong to marketers such as Plaintiff and Class Members. Due to PayPal's active concealment of this practice, any statutes of limitations that would typically apply to these allegations have been tolled and suspended.

## VII.   CAUSES OF ACTION
### COUNT ONE
CONVERSION

(on behalf of National class)

42. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

12

Class Action Complaint

43. Plaintiff and Class Members possessed or had the right to possess commissions they earned from referring consumers to products and services sold by eCommerce merchants. Each commission constitutes a specific and identifiable sum.

44. PayPal intentionally and substantially interfered with Plaintiff's and Class members' personal property by usurping their commissions and referral fees.

45. Without proper authorization, PayPal assumed and exercised the right of ownership over these commissions, in direct hostility to the rights of Plaintiff and Class Members, without justification.

46. PayPal's wrongful exercise of control over Plaintiff's and Class members' personal property amounts to conversion.

47. Plaintiff and Class members neither assented to nor ratified PayPal's interference with their referral fees or commissions

48. As a direct and proximate result of PayPal's conversion, Plaintiff and the Class were harmed.

49. PayPal is liable to Plaintiff and the Class for damages and costs permitted by law.

## COUNT TWO

TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

(On Behalf of National Class)

50. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

51. Plaintiff and the Class are engaged in contracts or ongoing business relationships with eCommerce merchants. Plaintiff and the Class drive customers to merchant stores through affiliate links, and return the merchants provide the Class with commissions. These contracts and economic relationships are ongoing

52. Defendants knew that Plaintiff and the Class worked to drive customers to their merchant partners' websites through affiliate links. Defendants knew that Plaintiff and the Class received their commissions based on associated unique affiliate cookies, and that the merchants

assessed the success of their affiliate program based on these cookies. Defendants knew these contractual and business relationships existed.

53. Defendants intentionally disrupted Plaintiff and the Class's performance of the contractual and business obligations, or knew that their actions made performance more expensive, difficult, or impossible. PayPal displaces these cookies that identify marketers as the source of the referral, stuffs their own cookies, and holds itself out as the referrer of the specific products and/or services even though the sale in question emanated from an online marketer's affiliate marketing link. PayPal intended to usurp commissions from Plaintiff and Class members through the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees from Plaintiff and Class members.

54. Plaintiff and the Class were harmed by PayPal's conduct because Honey deprives them of commissions and referral fees they rightfully earned as the true drivers of the merchant sales.

55. As a direct and proximate result of PayPal's conduct, Plaintiff and the Class suffered economic injury by being deprived of commissions they should have earned through their affiliate links.

56. As a result of the conduct described above, PayPal is liable to Plaintiff and the Class for damages in an amount to be determined at trial.

**COUNT THREE**
VIOLATION OF NORTH CAROLINA'S
UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
N.C. GEN. STAT. § 75-1, *ET SEQ*.
(on behalf of Plaintiff and the North Carolina Subclass)

57. Plaintiff incorporates the foregoing allegation as if fully set forth herein.

58. North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") disallows "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1.

59. PayPal's conduct was in and affecting commerce and constitutes an unfair or deceptive practice in violation of the UDTPA.

Class Action Complaint

60. PayPal's business acts and practices are unlawful because they wrongfully interfere with Plaintiff's and the North Carolina Subclass's business and contractual relationship, causing harm.

61. Specifically, Defendant's conversion and interference Plaintiff's contractual and business relationships constitutes a violation of the NC UDTPA.

62. PayPal wrongfully deprives Plaintiff and Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

63. PayPal actually and proximately caused harm to Plaintiff and Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

64. The conduct alleged herein is continuing and there is no indication that PayPal and will cease such activity in the future.

65. PayPal's conduct in violation of the UDTPA has caused Plaintiff and Subclass members to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiff and the members of the North Carolina Subclass thus suffered lost money or property as a result of PayPal's conduct.

66. As a consequence of the unfair or deceptive acts or practices engaged in by PayPal, Plaintiff and the Class have been damaged in an amount to be proven at trial, and, pursuant to N.C. Gen. Stat. § 75-1.1, § 75-16, and § 75-16.1, Plaintiff and the Class are entitled to injunction, all other appropriate relief in equity, restitution, the recovery of their actual damages, trebled, plus attorneys' fees and other costs of this action.

**PRAYER FOR RELIEF**

A. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully request that the Court:

B. Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

C. Enter judgment in favor of Plaintiff and the Class;

D.  Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including reformation of practices to prevent the Honey browser extension from taking credit for sales it did not originate;

E.  Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiff and Class members are entitled;

F.  Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

G.  Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

H.  Enter such other orders as may be necessary to restore to Plaintiff and Class members any money and property acquired by PayPal through its wrongful conduct;

I.  Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

J.  Award such other and further relief as the Court deems necessary and appropriate.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

DATED: January 3, 2025

**COTCHETT, PITRE & MCCARTHY, LLP**

By:  /s/ *Thomas E. Loeser*
Thomas E. Loeser, Cal Bar No. 202724
840 Macolm Road
Burlingame, CA 94010

And

Thomas E. Loeser, Cal Bar No. 202724
Karin B. Swope (*pro hac vice* pending)
Jacob M. Alhadeff (*pro hac vice* pending)
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Telephone: (206)-802-1272
Facsimile: (206)-299-4184

Class Action Complaint

tloeser@cpmlegal.com
kswope@cpmlegal.com
jalhadeff@cpmlegal.com
*Attorneys for Plaintiff*

Class Action Complaint